**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**


**UNITED STATES OF AMERICA**,

        Plaintiff,

vs.                                   No. **CR 02-450 MCA**

**FILBERTO SALDANA** and
**JORGE GARCIA-AVALOS**,

        Defendants.


**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANTS' JOINT MOTION TO SUPPRESS**


        **THIS MATTER** came before the Court on ***Defendants' Joint Motion to Suppress***
[Doc. No. 45] filed on August 5, 2002.  On November 1, 2002, the Court held an evidentiary
hearing on Defendants' joint motion in Albuquerque, New Mexico.  Having fully considered
the pleadings of record, the applicable law, the evidence and the arguments of counsel
presented at the hearing, and being fully advised in the premises, the Court **DENIES**
***Defendants' Joint Motion to Suppress*** based upon the following findings of fact and
conclusions of law.

**I.**        **FINDINGS OF FACT**

        1.        New Mexico State Police Officer Mike Valverde was on duty on traffic patrol
along Interstate 40 at approximately Mile Marker 135 in the Rio Puerco area west of

Albuquerque, New Mexico, between approximately 8:40 a.m. and 9:10 a.m., on or about March 2, 2002, when the events described below occurred.

2.      While traveling eastbound in the left lane of Interstate 40, Officer Valverde observed that the passenger in the back seat of a green Nissan minivan traveling in the adjacent right lane was not wearing a safety belt.

3.      From the vantage point of his police car in the left lane as he was about to pass the minivan, the officer was in a position to observe the location of the back-seat passenger in relation to the safety belt because that passenger was leaning up against the window of the minivan, the safety belt was a single-latch design with a shoulder strap that protruded above the window line, and there was enough sunlight to allow the officer to see through the minivan's windows, which were not reflective or darkly tinted.

4.      Based on this observation, Officer Valverde pulled his vehicle behind the minivan and engaged his emergency lights.  The minivan responded by pulling over to the side of the highway and stopping.

5.      After the two vehicles were stopped beside the highway, Officer Valverde approached the passenger side of the minivan alone on foot wearing his uniform with his gun holstered.  The officer's dog, "Tosca," remained in the back of the officer's vehicle.

6.      Upon reaching the front passenger door of the minivan, Officer Valverde observed that the minivan contained three occupants who were eventually identified as follows:  (a) Defendant Filberto Saldana, who was seated in the rear passenger seat and was not wearing a safety belt; (b) Defendant Jorge Garcia-Avalos, who was seated in the driver's

seat; and (c) another individual named Saul Saldana who was seated in the front passenger seat.

7.     Officer Valverde determined that the vehicle's occupants were Spanish speakers and proceeded to converse with them in the Spanish language during the course of the traffic stop and the ensuing investigation.  Although the officer's use of the Spanish language during this period was not grammatically perfect, the officer and the vehicle's occupants were able to communicate with one another in a manner that was sufficient to convey the information needed to conduct and respond to the stop and the investigation.

8.     Officer Valverde first informed the minivan's occupants that he stopped them because one of the occupants (Defendant Filberto Saldana) was not wearing a safety belt. Officer Valverde then requested to see the occupants' driver's licenses or other identification papers, as well as the registration and insurance documents for the minivan.

9.     While conversing with the minivan's occupants and awaiting production of the requested documents, Officer Valverde smelled a strong chemical odor, the source of which he could not readily identify.  He also observed that the key ring attached to the minivan's ignition key was not attached to any other keys, that the minivan's glove box was empty except for the registration documents, and that the interior of the minivan appeared extremely clean with no luggage present.

10.     The minivan's occupants handed the requested identification, license, and registration documents to Officer Valverde, but could not locate the requested insurance documents.

11.     Officer Valverde instructed Defendant Filberto Saldana to exit the minivan and wait beside the officer's vehicle while the officer reviewed the requested documents and wrote a traffic citation.  Defendant Filberto Saldana complied with this instruction.

12.     Upon reviewing the documents produced by the occupants, Officer Valverde observed that Defendant Filberto Saldana's driver's license was issued by the State of Arizona, that the licenses or identification cards produced by Defendant Garcia-Avalos and Saul Saldana were from Sinaloa, Mexico, and that the registration form indicated that the minivan had been registered to an individual named "Jose Feliciano" in the State of California on March 1, 2002 (the day before the stop).

13.     Officer Valverde continued to converse with the minivan's occupants while he  reviewed their documentation, checked the minivan's vehicle identification number (VIN), wrote a traffic citation, and called his dispatcher to request back-up and run a check on the vehicle's registration.

14.     In response to Officer Valverde's questioning during this period, Defendant Filberto Saldana reported that he was coming from Long Beach, California, where he had been for about a week, and that he was going to Denver, Colorado to look for work.  He indicated that he got (or got into) the minivan in Long Beach, California, but could only identify the first name of the minivan's registered owner.  He did not further explain how he (or the other occupants) obtained or borrowed the minivan from its registered owner, nor did he provide any information about the owner's whereabouts or telephone number.

-4-

15.     In response to the officer's questioning during this period, Defendant Garcia-Avalos reported that he was coming from Long Beach, California, and that he was going to Albuquerque, New Mexico for a couple of days to visit a friend or relative.  He correctly identified the first and last name of the minivan's registered owner, but did not provide any information about the owner's telephone number or whereabouts.

16.     In response to the officer's questioning during this period, Saul Saldana reported that he was just going along for the ride to help drive and that he was headed to Albuquerque, New Mexico for a couple of days.  He did not provide any information about the registered owner's identity, whereabouts, or telephone number.

17.     In response to the vehicle registration check, the dispatcher reported back to Officer Valverde that the minivan's registration was not on file, and Officer Valverde testified that this report was consistent with a vehicle that had been registered the day before the stop.

18.     Another uniformed New Mexico State Police Officer arrived at the scene while Officer Valverde was completing his questioning of the minivan's occupants, but did not engage in any show of force or actively participate in questioning the minivan's occupants prior to the search of the minivan.

19.     After conversing with the minivan's occupants, Officer Valverde issued a citation to Defendant Filberto Saldana for the safety-belt violation and a warning regarding the lack of proof of insurance for the minivan.  Officer Valverde then explained the options for contesting or admitting the violations alleged in the citation, and Defendant Filberto

-5-

Saldana signed the portion of the citation form indicating he would admit the violations and pay the fine.

20.     Based on his training, experience, and observations, Officer Valverde had reason to suspect that criminal activity was afoot at the time he issued the traffic citation based upon the totality of the circumstances, including:  (1) the strong, unidentified odor emanating from the minivan, which the officer believed could be used to mask the odor of contraband; (2) the lone ignition key and empty glove box; (3) the absence of any luggage in the minivan; (4) the fact that the minivan was reported to be coming from the Los Angeles basin, a major distribution center for illegal narcotics; (5) the differences in the minivan occupants' accounts of their travel plans with respect to destination (Denver, Colorado versus Albuquerque, New Mexico) and purpose (looking for work versus visiting friends or relatives); (6) the differences between the minivan's state of registration (California) and the states or countries listed on the occupants' drivers' licenses or identification cards (Arizona and Sinaloa, Mexico); (7) the recency of the minivan's registration; (8) the absence of any insurance documentation for the minivan; (9) the fact that none of the minivan's occupants was the registered owner of the minivan; and (10) the minivan occupants' apparent inability to provide sufficiently detailed information on the registered owner's identity, telephone number, or whereabouts.

21.     By the time that Officer Valverde finished issuing the citation, he had returned all of the minivan occupants' license and identification documents, as well as the registration documents for the vehicle.

22. After issuing the citations and returning the occupants' documents, Officer Valverde proceeded to ask each occupant if he was carrying illegal drugs, weapons, or large amounts of money.

23. Defendants each responded to this line of questioning in the negative. They also each volunteered a statement to the effect that they did not own or were not responsible for the contents of the minivan. Officer Valverde observed a change in Defendant Filberto Saldana's demeanor when he pursued this line of questioning, as evidenced by behavior such as avoiding eye contact, mumbling, and/or exhibiting what the officer described as a nervous laughter. The officer observed a similar change of demeanor in Defendant Garcia-Avalos.

24. Saul Saldana also responded to the above line of questioning in the negative but, according to Officer Valverde, did not say anything further.

25. After finishing this line of questioning, the officer proceeded to request and obtain in the Spanish language, both orally and in writing, each occupants' consent to search the minivan.

26. Considering the totality of the circumstances, the consent of each Defendant was knowingly and voluntarily given without duress or coercion.

27. Upon receiving verbal and written indications of consent to search the minivan and continuing to have suspicions that criminal activity was afoot, Officer Valverde summoned his dog, "Tosca," and accompanied the dog around the perimeter of the minivan for the purpose of detecting whether the odor of narcotics was emanating from the minivan.

28.     Officer Valverde's and his dog, "Tosca," are certified in drug detection, and the dog is trained to detect and passively alert to the distinctive odors of cocaine, heroin, marijuana, and methamphetamine.

29.     Although the dog did not alert while walking around the perimeter of the vehicle, when permitted to enter the minivan's interior, she alerted to an air vent underneath the back seat near the rear quarter-panel area.

30.     Officer Valverde then further inspected the left rear quarter-panel area of the minivan and discovered a false compartment in that area containing approximately two (2) kilograms of a substance which field-tested positive for cocaine, and approximately two and one-half (2½) pounds of a substance that field-tested positive for methamphetamine.

## II.     LEGAL ANALYSIS AND CONCLUSIONS OF LAW

In their joint motion, Defendants contend that the officer was not justified in stopping the minivan in which they were traveling, that the ensuing investigative detention was unreasonable because it exceeded the proper scope of a traffic stop, and that their consent to search the minivan was not knowing and voluntary.  The Court concludes that none of these contentions have merit, and therefore Defendants' joint motion is denied.

The Fourth Amendment to the United States Constitution protects Defendants' rights to be secure in their persons and effects against unreasonable searches and seizures. "[A]utomobiles are 'effects' under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness."  United States v. Chadwick, 433 U.S. 1, 12 (1977), overruled in part on other grounds, California v.

<u>Acevedo</u>, 500 U.S. 565 (1991).  In addition, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of" the Fourth Amendment.  <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996).  Thus, Defendants were seized within the meaning of the Fourth Amendment when Officer Valverde stopped the minivan to investigate and issue traffic citations.  <u>See</u> <u>id.</u>

The seizure of Defendants' persons is "reasonable" under the Fourth Amendment "'if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  <u>United States v. Callarman</u>, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting <u>United States v. Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir. 1995) (en banc)).  The subjective motivations of the officer performing the stop are not relevant to determining whether that officer's suspicions are "reasonable" under the Fourth Amendment.  <u>See</u> <u>Arkansas v. Sullivan</u>, 532 U.S. 769, 771-72 (2001).

Under the relevant provisions of New Mexico's recently amended Safety Belt Use Act, "each occupant of a motor vehicle having a gross vehicle weight of ten thousand pounds or less manufactured with safety belts in compliance with federal motor vehicle safety standard number 208 shall have a safety belt properly fastened about his body at all times when the vehicle is in motion on any street or highway."  N.M. Stat. Ann. § 66-7-372(A) (Michie 1978 & Supp. 2002).  In this case, Officer Valverde credibly articulated specific facts which gave rise to a reasonable suspicion that one of the minivan's occupants was

committing a safety-belt violation at the time the officer first observed the minivan from the vantage point of the adjacent passing lane.  See Callarman, 273 F.3d at 1283.  Thus, the traffic stop of Defendant's vehicle was justified at its inception.

Before issuing a traffic citation, the Fourth Amendment permits a police officer who has made a lawful traffic stop to request a driver's license and vehicle registration from the vehicle's occupants, see United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998), ask about their travel plans and ownership of the vehicle, see United States v. Rivera, 867 F.2d 1261, 1263 (10th Cir. 1989), and respond to objectively reasonable concerns about the officer's safety, see United States v. Holt, 264 F.3d 1215, 1220-26, 1228-30 (10th Cir. 2001) (en banc).  In this instance, Officer Valverde's actions prior to the issuance of the traffic citation fell within these permissible boundaries of a traffic stop.

The Fourth Amendment generally requires that a routine traffic stop must end promptly as soon as the traffic citations have been issued and the driver's license, registration, and insurance information have been reviewed and found to be in proper order. See Hunnicutt, 135 F.3d at 1349.  There are, however, two relevant exceptions to this general rule.  "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occuring."  Id.  "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter."  Id.

The first of these exceptions applies in this case because the officer developed a reasonable suspicion of criminal activity which was sufficient to justify further detention for

the brief period necessary to allow the officer to finish his conversation with the minivan's occupants and perform a canine sniff of the vehicle after the traffic citations had been issued. The Court's analysis of the basis for such suspicions does not depend on whether or not the officer or Defendants subjectively thought they were involved in a consensual encounter after the traffic citations were issued because "[t]he subjective intentions or state of mind of either the defendant or police is irrelevant to Fourth Amendment analysis." United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996). Further, determining the objective reasonableness of the suspicion that prompted the officer to want to further question Defendants and perform a canine sniff of the vehicle does not depend on any one factor or series of factors. See United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Rather, the Court must consider the totality of the circumstances. See United States v. Arvizu, 534 U.S. 266, 273 (2002).

"In examining the totality of the circumstances, '[c]ommon sense and ordinary experience are to be employed and deference is to be accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions.'" United States v. De La Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998) (quoting United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997)). Reasonable suspicion may be based on "'a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation.'" Lopez-Martinez, 25 F.3d at 1484 (quoting Terry v. Ohio, 392 U.S. 1, 22 (1968)). An officer cannot, however, predicate an investigative detention solely upon a hunch, see De La Cruz-Tapia, 162 F.3d at 1277, or rely solely upon generic facts that are so

-11-

innocent or susceptible to varying interpretations as to be innocuous, see Wood, 106 F.3d at 946.

In this case, the Government presented evidence concerning a number of specific factors which may be readily susceptible to an innocent explanation if considered alone, but which nevertheless combine to form a reasonable basis for the officer's suspicion that criminal activity was afoot. See Arvizu, 534 U.S. at 277-78. In particular, the Court notes the evidence of (1) the strong, unidentified odor emanating from the minivan, which the officer believed could be used to mask the odor of contraband; (2) the lone ignition key and empty glove box; (3) the absence of any luggage in the minivan; (4) the fact that the minivan was reported to be coming from the Los Angeles basin, a major distribution center for illegal narcotics; (5) the differences in the minivan occupants' accounts of their travel plans with respect to destination (Denver, Colorado versus Albuquerque, New Mexico) and purpose (looking for work versus visiting friends or relatives); (6) the differences between the minivan's state of registration (California) and the states or countries listed on the occupants' drivers' licenses or identification cards (Arizona and Sinaloa, Mexico); (7) the recency of the minivan's registration; (8) the absence of any insurance documentation for the minivan; (9) the fact that none of the minivan's occupants was the registered owner of the minivan; and (10) the minivan occupants' apparent inability to provide sufficiently detailed information on the registered owner's identity, telephone number, or whereabouts. The officer testified that, based on his training and experience, these were common traits of vehicles used in the smuggling of illegal narcotics.

The officer's reasonable suspicion based on the totality of the circumstances justified further detention of Defendants and the minivan for purposes of conducting a canine sniff. Ordinarily, "a canine sniff of an already legitimately detained automobile is not a 'search' within the meaning of the Fourth Amendment." Hunnicutt, 135 F.3d at 1350. To the extent that the canine sniff constituted a search of the minivan in this instance because the dog entered the minivan's interior before alerting to the presence of suspicious odors, Defendants are not in a position to contest that search for the following additional reasons.

In order to challenge the search of the minivan, it is Defendants' burden to first establish that they have an interest in the minivan that is protected by the Fourth Amendment. See United States v. Arango, 912 F.2d 441, 444 (10th Cir. 1990); United States v. Rascon, 922 F.2d 584, 587 (10th Cir. 1990). They have not met this burden here.

The existence of a cognizable Fourth Amendment right to be free from unreasonable searches and seizures of a motor vehicle depends on two factors: whether the individual in question has exhibited a subjective expectation of privacy in the vehicle, and whether society recognizes that subjective expectation as reasonable. See Rascon, 922 F.2d at 586. Although formal documentation (such as a certificate of title or registration form) is not necessarily required in order to establish proof of ownership or legitimate possession, mere possession or control of the vehicle alone is not sufficient to satisfy this test. See United States v. Jefferson, 925 F.2d 1242, 1249-50 (10th Cir. 1991); Arango, 912 F.2d at 445.

In this case, Defendants made statements disclaiming ownership or responsibility for the contents of the minivan when the officer questioned them about whether they were

carrying any contraband in the vehicle.  Further, Defendants were not the registered owners of the minivan and could not provide the officer with a sufficient explanation of their relationship to the owner or how the minivan legitimately came into their possession.  Under these circumstance, Defendants have demonstrated no more than mere possession or control of the minivan, which is not enough to establish their standing to challenge the dog's search of the minivan's interior.

To the extent that Defendants had a reasonable expectation of privacy in the areas of the minivan's interior into which the officer's dog intruded, their oral and written consent to the search of those areas was knowing and voluntary.  To prove that a defendant's consent was knowing and voluntary, it is the Government's burden to show that their was no duress or coercion, that the consent was unequivocal and specific, and that the consent was freely and intelligently given.  See United States v. Rodriguez-Garcia, 983 F.2d 1563, 1567 (10th Cir. 1993).  The Government met this burden here.

Although it is arguable that Defendants remained under investigative detention at the time they signed the consent forms, this fact alone does not render their consent involuntary.  See id.  Rather, the Court must consider the totality of the circumstances.  See id.  In particular, the Court notes that the officer requested consent in the Spanish language both orally and in writing, and there is no indication that Defendants could not understand the officer's request or attempted to raise any objection to it.  Further, Defendants documents had been returned to them at the time of the request, and there is no indication of an express or implied show of force by the officers present at the scene that would suggest the consents

-14-

were obtained under coercion or duress.  In view of the totality of the circumstances, the Court concludes that Defendants' consent to the search of the minivan was knowing and voluntary.  See id. at 1567-68.

Once the officer's dog alerted to the area of the rear quarter panel of the minivan, the officer had probable cause to continue the search by removing the minivan's interior trim to reveal the contraband discovered in the false compartment.  See United States v. Massie, 65 F.3d 843, 849 (10th Cir. 1995).  Because the entire detention and search met the Fourth Amendment's requirement of reasonableness, the exclusionary rule provides no basis for suppressing the evidence or statements that resulted from these activities.  See id.

## III.   CONCLUSION

Because the investigative detention and search challenged by Defendants in this case met the applicable constitutional requirements, the exclusionary rule does not provide any basis for suppressing the evidence or statements that were produced as a result of those activities.

**IT IS, THEREFORE, ORDERED** that *Defendants' Joint Motion to Suppress* be and hereby is **DENIED**.

**SO ORDERED**, this 7th day of November, 2002, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-15-

Counsel for the Government:
> **Erlinda V. Ocampo**
> Assistant U.S. Attorney
> Albuquerque, New Mexico

Counsel for Defendant Filberto Saldana:
> **David Serna**
> Albuquerque, New Mexico

Counsel for Defendant Jorge Garcia-Avalos:
> **Lawrence E. Chacon**
> Albuquerque, New Mexico